

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. AP-77,110

## TAYLOR RENE PARKER, Appellant

### v.

## THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 20F1345-202 IN THE 202ND JUDICIAL DISTRICT COURT BOWIE COUNTY

FINLEY, J., delivered the opinion of the Court in which SCHENCK, P.J., and RICHARDSON, YEARY, NEWELL, WALKER, MCCLURE, and PARKER, JJ., joined. WALKER, J., filed a concurring opinion in which SCHENCK, P.J., and RICHARDSON and PARKER, JJ., joined. KEEL, J., concurred.

## O P I N I O N

In November 2022, Appellant was tried for and convicted of capital murder pursuant to Section 19.03(a)(2) of the Penal Code for committing the murder of an individual in the course of committing or attempting to commit a

kidnapping. TEX. PENAL CODE § 19.03(a)(2). On the basis of the jury's answers to the statutorily required special issues, Appellant was sentenced to death. TEX. CODE CRIM. PROC. art. 37.071, § 2(b), (e). Direct appeal to this Court is automatic. *Id.*, § 2(h). Appellant raises twenty-five points of error. Finding no reversible error, we affirm Appellant's conviction and sentence of death.

## I.      Factual Background

At the age of seventeen, Appellant gave birth to her first child, Emersyn, with her then-boyfriend Donald Whiteside. The couple eventually split, and Appellant began dating and later married another man, Tommy Wacasey. At the age of twenty-one, Appellant gave birth to her second child, a son named Trey, with Wacasey. She had to be induced because of a condition called preeclampsia, a pregnancy complication characterized by elevated blood pressure and protein in the urine. Due to this complication, Appellant decided to undergo a tubal ligation to prevent future pregnancy. A tubal ligation can, in some circumstances, be reversed.

The tubal ligation eventually failed. Two years after giving birth to Trey, Appellant had an ectopic pregnancy. An ectopic pregnancy is a pregnancy where the egg implants in a fallopian tube instead of in the uterus. During an exploratory surgery to resolve the ectopic pregnancy, doctors discovered that Appellant had complex cysts and scarring from endometriosis. Endometriosis is a condition where the lining of the uterus grows outside of the uterus. With

Appellant under anesthesia, Wacasey authorized doctors to perform a hysterectomy. Doctors removed Appellant's uterus, cervix, and one of her ovaries. When Appellant woke up after the surgery, she "flew off the handle and asked why [Wacasey] didn't wake her up so she could make that decision."

Appellant and Wacasey divorced in 2017. Soon after, Appellant began dating Hunter Parker. The couple married in 2018. During her relationship with Parker, Appellant asked multiple friends to serve as surrogates because she wanted to have more children but could not because of the hysterectomy. Appellant and Parker divorced in 2019.

Appellant then began dating Wade Griffin. Several witnesses at trial testified that Appellant was "obsessed with him," and would be "ecstatic" around him, even though "you could tell he didn't feel that way about her." The State introduced evidence of several instances when Appellant went to great lengths to keep Griffin in the relationship.[1] Appellant told Griffin she was pregnant in January 2020. In the following months, Appellant purchased a silicone moon belly online as well as a customized ultrasound, prepared a nursery in Griffin's home, had a maternal photoshoot, held a gender reveal party, and chose a name for the baby.

Appellant's original "due date"—in late September 2020—passed

---

[1] *See infra* at Part V.

without Appellant giving birth. Appellant told Griffin that she would be induced or have a C-section at Titus Regional Medical Center in Mount Pleasant, Texas, on October 5, 2020. On the morning of October 5, Griffin's house caught on fire. He was able to put out the fire with a water hose. Later that morning, the medical center received a bomb threat and had to evacuate. Appellant blamed both of these events on her mother, Shona Prior.

Appellant then told Griffin that, in order to avoid her mother, she had decided to travel to Idabel, Oklahoma, to give birth at McCurtain Memorial Hospital. On the morning of October 9, 2020, Appellant sent Griffin to drop off hogs in Wynnewood, Oklahoma, and then to meet her at the hospital in Idabel.

Instead of traveling to Idabel, Appellant went to the home of Reagan Hancock, whom Appellant knew was pregnant, and arrived at around 7:30 a.m. What followed was characterized by the State as a "slaughtered woman in her home [and] a missing baby,"—a "fetal abduction." The crime scene technician, Marc Sillivan, testified that Reagan was attacked in several places around the house, with multiple strikes in each location, and she continued standing and walking while bleeding. The assault continued while Reagan was on the floor.

The medical examiner, Dr. Melinda Flores, testified that Reagan had 113 sharp force injuries—fifteen stab wounds and ninety-eight incised wounds. Two wounds perforated Reagan's jugular vein. Several went all the way to the bone. Reagan also suffered thirty-nine blunt-force injuries, primarily to her

face and head, as well as a broken nose and five skull fractures. Dr. Flores testified that the injuries to Reagan's head indicated that she may have been hit in the head by a hammer. Dr. Flores also testified that there was evidence of possible strangulation. Reagan lost so much blood in the attack that some of her wounds did not even bleed due to low blood pressure.

After murdering Reagan, Appellant performed a crude C-section to remove Reagan's unborn child, Braxlynn. Appellant cut a "large incised wound going across [Reagan's] lower abdomen with her uterus coming through it." The uterus was also opened. Appellant also removed the placenta and umbilical cord.

Cell tower data showed that Appellant left Reagan's house between 9:09 and 9:14 a.m. At 9:36 a.m., Appellant was stopped by Trooper Lee Shavers after he observed her driving erratically, speeding, and almost hitting another vehicle. After contacting Appellant, Trooper Shavers observed an "umbilical cord going down into [Appellant's] pants," and a baby that was not breathing and appeared "very limp, kind of white in color." Two ambulances transported Appellant and Braxlynn to McCurtain Memorial Hospital. Appellant was arrested at the hospital, and Braxlynn was later pronounced dead.

Appellant was charged with capital murder. The State's theory at trial was that Appellant "intentionally cause[d] the death of [Reagan] . . . and [Appellant] was then and there in the course of committing or attempting to

commit the offense of kidnapping [Braxlynn]." *See* TEX. PENAL CODE § 19.03(a)(2). The jury found Appellant guilty of capital murder as alleged in the indictment and answered the punishment phase special issues in favor of the death penalty.

## II.    Sufficiency of the Evidence

In her first point of error, Appellant argues that the evidence is insufficient to support that the aggravating factor—kidnapping or attempted kidnapping—occurred. Appellant does not contest that the evidence is sufficient to show that she committed the murder of Reagan. Appellant only contends that the State failed to prove that Braxlynn was "born and is alive" for purposes of kidnapping or attempted kidnapping. Appellant asks this Court reform the judgment of conviction from capital murder to first-degree murder. We overrule Appellant's first point of error.

### a.  Applicable Law

#### i.    *Sufficiency*

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Evidence is legally sufficient to support a conviction if, when viewing all of the evidence in the light most favorable to the verdict, any rational juror could have found the

essential elements of the crime beyond a reasonable doubt. *McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023); *Jackson*, 443 U.S. at 319.

When conducting a sufficiency review, we consider all of the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We do not sit as the thirteenth juror, and we do not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023). The jury is permitted to draw reasonable inferences from the evidence adduced at trial. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Additionally, the jury may use common sense, common knowledge, personal experience, and observations from life when drawing inferences. *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

The sufficiency of the evidence is measured against the hypothetically correct jury charge, defined by the statutory elements as modified by the charging instrument. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge is one that accurately states the law, is authorized by the indictment, does not increase the State's burden of proof, and adequately describes the offense with which the defendant is charged. *Id.*

*ii.    Elements*

A person commits the offense of capital murder "if the person commits murder as defined under Section 19.02(b)(1) and: . . . (2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping." TEX. PENAL CODE § 19.03(a)(2). A person commits the offense of kidnapping "if he intentionally or knowingly abducts another person." *Id.* § 20.03(a). "Person" is defined as "an individual." *Id.* § 20.01(4). An individual is defined as "a human being who has been born and is alive." *Id.* § 20.01(5).

A person commits the offense of criminal attempt if, "with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended." *Id.* § 15.01. "We have construed the attempt statute to draw an 'imaginary line' that separates an act that amounts to no more than 'mere preparation' from an act that tends but fails to effect the commission of the offense." *Swenson v. State*, 707 S.W.3d 297, 302 (Tex. Crim. App. 2024). "The precise intent of Section 15.01 is to punish action for the intended offense while allowing intervention before an act which could constitute the offense itself occurs." *Id.* (quoting *Godsey v. State*, 719 S.W.2d 578, 583 (Tex. Crim. App. 1986)).

Appellant does not challenge the sufficiency of the evidence to support the murder of Reagan. Instead, Appellant only challenges the sufficiency of the

State's evidence to show that Braxlynn was "born and is alive" during the kidnapping or attempted kidnapping. We reject this argument for two reasons. First, when viewing the evidence in the light most favorable to the verdict, a rational juror could find, beyond a reasonable doubt, that Braxlynn was "born and is alive" at the time Appellant kidnapped her. Second, there was sufficient circumstantial evidence for a rational juror to conclude, beyond a reasonable doubt, that Appellant had taken a step that amounted to more than mere preparation towards kidnapping Braxlynn.

### b. Relevant Facts

Elton Crossland, a flight paramedic for LifeNet Air, was working with his partner Allison Moses on the morning of October 9, 2020, when they were dispatched to Trooper Shavers's location at 9:37 a.m. They arrived on scene at 9:49 a.m. Crossland testified as follows:

> Q. Okay. When you arrived on the scene, tell the jury kind of what's going on out there.
>
> A. We arrived on scene, exited our vehicle, walked back to where Trooper Shavers and bystanders were, and when we got up to the door, there was a woman sitting in the front seat holding a newborn. We could see the baby was gray and ash in color; umbilical cord was still attached.

Crossland further testified:

> Q. Have you, in your experience as a paramedic, come across women who have given birth outside of the hospital, whether it be in a car or at home or things of that nature?

A.    Yes.

Q.    So when you walked up to the car, and you saw the baby with the umbilical cord still attached, what's running through your mind at that time?

A.    Getting the cord clamped and getting the baby into the ambulance so that we can start full-blown CPR. The difference being doing compressions and breathing, it only gets you so far. Being an ALS provider, or paramedic, I can — there's different drugs I can push to try to improve the outcome.

Q.    You mentioned the appearance of the baby was ashen. What else did you know about — or did you notice about the baby?

A.    That the amniotic fluid that was still on the baby was dried and flaky, signaling to us that the baby wasn't just born. It had been at least several minutes.

Q.    And a baby that has just been born, what were you expecting to see?

A.    Ideally, when we show up, we would see a baby that was kind of pink-ish in color and crying.

Q.    And the woman holding the baby, was she still there sitting in the car —

A.    Yes.

Q.    — when you got there? Okay. And she was identified to you later as Taylor Parker?

A.    Yes.

Q.    What was she doing when you got to the scene and when you walked up to the car and saw the baby?

A.    When I walked up to the car, she seemed pretty calm, and she was — to us, she was very adamant that if we took the baby, it had to go to Idabel. She seemed fairly calm.

Q.    And when you asked her about how she had the baby or more circumstances, what did she tell you?

A.    That she was driving down the road, felt her water break, and the baby just came out.

Q.    And when you heard her say that, was your impression that the baby was born in that car that she was sitting in?

A.    No.

Q.    And why not?

A.    The birth of a baby is not a very neat or clean process. There was no blood or amniotic fluid in the car or in the seat where she was sitting. To us, it was obvious the baby was not born in that car.

That Braxlynn had not been born in Appellant's car was later confirmed:

Q.    When you cut the umbilical cord, what did you notice?

A.    That the — normally when you cut it, you get a small amount of blood in it, even when it's clamped, but when we cut it, the blood seemed like it was separated already, kind of the serum from the plasma, and almost looked like it had blood clots in it.

Q.    What did you think about that? Why was that unusual?

A.    It told us — again, it reasserted to us that it had been several minutes since the baby was born. It was not recent.

Q.    So when you first arrived at the scene, you were under the impression that this baby had maybe been born just minutes before your arrival, and based on what you're seeing and your assessment, was that matching up?

A.  No.

Crossland then testified that treatment on Braxlynn was started:

Q.  Once you were in the back of the ambulance with the baby, what did y'all do?

A.  We got an IO — or intraosseous I.V. started in the left lower leg. We started giving I.V. fluids and giving doses of epinephrine. We were continuing CPR. We then intubated the patient so we could breathe for her.

* * *

Q.  At that point, did the baby have a pulse?

A.  No, she did not.

Q.  Okay. Was the baby breathing?

A.  No, she was not.

Q.  Okay. When you first got there and saw the baby, did you notice any signs of life?

A.  No.

Q.  Once you got her in the ambulance, and you were able to administer medication, what type of medication were you giving?

A.  Epinephrine.

Q.  And what's that going to do?

A.  It's — epinephrine is also known as adrenaline. It causes contractility of the heart. It helps restore a pulse, in conjunction with CPR.

Q.  Okay. And the jury has heard that the baby was a baby girl. Was that —

A.     Yes.

* * *

Q.     Elton, y'all decide that the closest place is going to be Idabel. How long did it take y'all to get there?

A.     I'm not sure off the top of my head. If we could go back to the first page, it's got the times on it. Looks like it took us 34 minutes.

Q.     During the 34 minutes of transport from DeKalb to Idabel, what are you doing to the baby in the back?

A.     We're continuing CPR, continuing to ventilate her with a bag-valve-mask, continuing to give epi every three to five minutes, and trying to get her warm.

Q.     Were you eventually able to get a pulse back?

A.     Yes.

Q.     Okay. So by the time you arrived at the Idabel hospital, the baby had a pulse?

A.     Yes.

Q.     And is that reflected here on the vital signs taken at 10:37, that there was a pulse?

A.     Yes.

Q.     When you arrived at the Idabel hospital, what happens there at the hospital?

A.     One of the OB nurses met us outside. I guess there had been some miscommunication. I think they thought we were coming in with just a baby that had been delivered. We came out of the back of the truck. The heart rate was less than 60. So we were still doing chest compressions, and she was still

not breathing. So we were breathing for her. So they took us up to the second floor to their OB unit.

Crossland testified that he observed no cuts, scrapes, abrasions, or visible injuries on Braxlynn.

On cross-examination, Crossland further explained his observations about Braxlynn's heartbeat:

Q. But you said that there was a heartbeat at some point?

A. Yes.

Q. Now, did you know that because you had placed monitors on the chest?

A. We saw — we saw changes on the monitor, which signaled to us — we had her on end-tidal capnography, waveform capnography. On our monitor, we saw a spike in that reading, which in a cardiac arrest, signifies a return of circulation.

Q. But it doesn't indicate whether it's going to be maintained or not?

A. It does not.

Q. And was it just very faint?

A. The reading was — the capnography reading was very good, and it stayed — now, the pulse that we felt, I could actually palpate it with my fingers and feel it, but it was very weak.

On-redirect examination, Crossland testified:

Q. I remember talking to you, and you said when y'all got the pulse back, and by back, if a baby is stillborn and born without a pulse, there's no pulse to get back. Does that make sense?

A.    Correct.

Q.    Okay. From time to time you got the pulse back, you were excited and thought, we may have saved this baby?

A.    Yes, yes. From Idabel back to New Boston, we were on cloud nine. We thought we had done something that, in all honesty, we thought was futile from the time we left the scene, but it's a newborn. I'm not — I mean, we've got to do something. So when we got a pulse back, we thought, wow, you know, this is awesome.

Q.    And that last question that you were asked, that the baby was never alive, you don't know what the baby's condition was when she was taken via C-section from her mother's womb?

A.    No, I do not.

Q.    You saw the baby at a time later, and your testimony was the conditions were that she had not just been born?

A.    That's correct.

Q.    And if the medical records reflect that the baby's time of death was sometime around one o'clock p.m., that baby was alive from when you got the heartbeat back in the ambulance to the time that she was declared deceased?

A.    Yes.

Crossland's testimony was corroborated by Dr. William Herron, the only doctor in McCurtain County, Oklahoma, that delivers babies. Dr. Herron testified that he had forty-one years of experience in the medical field, all at McCurtain Memorial Hospital. Dr. Herron received a call to come into the hospital on the morning of October 9, 2020, while still at home. Braxlynn

"barely had a pulse and no spontaneous respirations" when Dr. Herron arrived.

Dr. Herron testified:

> Q.  Okay. Dr. Herron, in your training and experience, an infant, seven pounds, approximately 35 weeks gestation, is that an infant who, absent any conditions, is viable?
>
> A.  Yes.
>
> Q.  There, it also notes, at 10:50, the pulse was 58. It says pacing. Is that because of the —
>
> A.  External pacemaker, yes.

Dr. Herron further testified, just as Crossland did:

> Q.  Okay. Doctor, the questions I'm about to ask you are based on things that have been asked of other witnesses in the courtroom over the past couple of weeks. The baby, as we know now, was brought to the hospital there at 10:26, 10:27, and based on the information given by Taylor Parker to law enforcement, at 9:36, she tells that the baby is about 35 minutes old. So I'm telling you that information to ask you that if, according to Taylor Parker, the baby was, this is being generous, born about nine a.m.?
>
> A.  Yes.
>
> Q.  I remember you telling me that that time span of maybe 40 minutes, from 9:00 to 9:40, 9:45, when LifeNet arrives, if that baby had been dead that entire time, do you believe they would have been able to get a pulse back?
>
> A.  No.
>
> Q.  I remember you told me that essentially logic tells you that baby was alive because they were able to get a pulse back?
>
> A.  Yes.

And later on re-direct examination:

> Q. Okay. So back to my original question to you on direct, about if the baby was born deceased about nine a.m., and the paramedics are not administrating these lifesaving efforts until after 9:45, in your expert opinion, do you believe they would have revived a stillborn or deceased baby?
>
> A. No.

Dr. James Scales, a physician in obstetrics and gynecology at the Genesis Prime Care Clinic also testified for the State. Dr. Scales testified that, over the course of over twenty years, he had delivered approximately 200 babies a year and was familiar with C-section procedures. Dr. Scales testified that Reagan "was not" having complications during her pregnancy, and that Braxlynn had no abnormalities. Dr. Scales further testified that he was "surprised" that Braxlynn had no visible injuries or knife nicks because even "trained" doctors, going through "layers [of skin] very carefully and relatively slowly" sometimes will "nick" a baby. Dr. Scales further explained:

> Q. Okay. The medical examiner and actually, I believe, it was the doctors from the Idabel hospital weighed the baby and measured the baby. Those results were that she was seven pounds and 18.75 inches. So when we're talking a woman who is 35 weeks pregnant and the baby is that size, would that be, in your experience, a viable baby?
>
> A. Yes.
>
> Q. And, Doctor, do you recall us showing you some of the autopsy photos in this case of Reagan?
>
> A. Yes.

Q. Okay. And we specifically showed you the one of the cut in the uterus, to the back of the uterus. Do you remember that?

A. I remember it.

Q. And I recall you said it was maybe a little bit bigger than would be necessary, but it wasn't that bad?

A. Correct.

Q. So your opinion, I think, was the person who had performed that C-section had taken some reasonable care as far as cutting into the uterus?

A. They didn't do bad.

Lastly, the State called Shonnaree Yeager. While Yeager was held at Bowie County's Bi-State Jail, she met Appellant. Yeager was a jail "trusty" who helped do laundry. A "trusty" is an inmate who displays good behavior and is permitted to assist with jail operations and move about the jail. Due to her "trusty" status, Yeager was able to speak to Appellant. Yeager testified the following about her conversations with Appellant:

Q. Did Taylor Parker discuss with you that she had convinced her boyfriend, Wade Griffin, that she was pregnant?

A. Yes.

Q. And did she give you a lot of detail on that, or did she just tell you that she had convinced him she was pregnant?

A. Not a lot of detail, but that he believed her, that he believed that she was pregnant.

Q. She's believable, isn't she?

A.  Very believable.

Q.  All right. I want to talk to you about, did Taylor Parker tell you about when she went to cut the baby out of Reagan Hancock, did she tell you about that?

A.  Yes.

Q.  All right. I think you said that started with a knife?

A.  Started with a knife that was there, and it didn't work as well as she wanted it to. So she went to her vehicle where she had some sort of kit that she used on animals, and it had a scalpel.

Q.  All right. So she had a scalpel, and did she use the scalpel to finish cutting the baby out?

A.  Yes.

Q.  Okay. And then what happened after the baby was cut out, Shonna?

A.  She said she placed the baby up against Reagan's cheek and told her, you know, tell mama bye.

Q.  So the baby is alive?

A.  Yes, ma'am.

Q.  And she told the baby, tell mama bye?

A.  Yeah.

Q.  All right. Did the — she — well, sorry. Hold on a second. Did she tell you that she was — well, what happened after that, Shonna? Did she get in her car and leave?

A.  She says she was going to the hospital.

Q.     Okay. And wasn't going to the hospital because the baby is in distress or anything like that?

A.     No.

Q.     Okay. She was on the way to the hospital. In your discussions with me, you said that you believe she wanted to make a record that she had had the baby at the hospital?

A.     Yes, ma'am.

Q.     All right. On her way to the hospital, what happens to the baby?

A.     She says she looks over, and the baby is not breathing, and she pulled over.

Q.     Okay. And she pulled over?

A.     Yes.

Q.     She didn't tell you that she got pulled over?

A.     No.

Q.     She told you that she pulled over?

A.     She pulled over.

Q.     Okay. And then she tells you that — what did she tell you about the cord, the umbilical cord and all that?

A.     That it was in — it was coming out of her pants.

Q.     And that the first responders just —

A.     Assumed that she had given birth, with the baby —

Q.     But she didn't tell them that she had?

A.    She didn't say that she told them, said that they just assumed based on the umbilical cord.

**c. Analysis**

*i.    Kidnapping*

The evidence presented at trial, when viewed in the light most favorable to the verdict, was sufficient for a rational juror to find beyond a reasonable doubt that Braxlynn was "born and is alive" at the time Appellant kidnapped or attempted to kidnap her.

Based on Crossland's and Dr. Herron's testimonies, a rational juror could believe, beyond a reasonable doubt, that Braxlynn was not born in the vehicle. Crossland testified that the amniotic fluid on Braxlynn was dried and flaky. Furthermore, Crossland testified that when the umbilical cord was cut, the blood in the cord was already separated and clotting. Based on this testimony, a rational juror could have concluded that Braxlynn had been born elsewhere and sometime before Appellant was stopped by Trooper Shavers.

A rational juror could have also believed that the LifeNet paramedics were able to restore Braxlynn's heartbeat. Crossland testified that the heartbeat monitored on "end-tidal capnography, waveform capnography" signified "a return of circulation." Dr. Herron also testified that Braxlynn "barely had a pulse" when he arrived at the hospital.

Based on this testimony, a rational juror could have concluded that Braxlynn was born alive. Both Crossland and Dr. Herron testified that it would have been impossible for the paramedics, based on the known timeline, to restore the heartbeat of a stillborn baby. A rational juror could have credited this testimony and inferred that Braxlynn must have been born alive at the time of Appellant's crude C-section because, if not, the paramedics would not have been able to later restore Braxlynn's heartbeat. Furthermore, Drs. Herron and Scales both testified that Braxlynn was "viable," and Dr. Scales testified that Appellant's crude C-section did not harm Braxlynn and was not poorly performed. A rational juror could have believed this testimony and inferred that because Braxlynn was not injured during the C-section and was otherwise viable, she was born alive.

Moreover, a rational juror could have also believed Yeager's testimony and credited Appellant's confession that Braxlynn was born "alive." Yeager testified that Appellant, after performing the C-section, "placed the baby up against Reagan's cheek and told her, you know, tell mama bye." Afterwards, Yeager testified that Appellant took Braxlynn to the hospital but did not do so because Braxlynn was in distress. A rational juror could have inferred from Appellant's actions that Braxlynn was born alive at the time of the C-section because Appellant would not have told a stillborn baby to "tell mama bye" or taken a stillborn baby to a hospital. Based on Yeager's testimony, a rational

juror could have concluded that Braxlynn was born alive during the C-section, and that Appellant was taking Braxlynn to a hospital until Appellant pulled over because she realized Braxlynn was no longer breathing, at which point Appellant tried to make it appear as though she had just had the baby before she was stopped by Trooper Shavers. This is consistent with Crossland's testimony that Braxlynn was not born inside the vehicle based on the physical observations Crossland made at the scene.[2]

### ii. Attempted Kidnapping

Alternatively, the evidence presented at trial, when viewed in the light most favorable to the verdict, was sufficient for a rational juror to find beyond a reasonable doubt that Appellant had taken a step that amounted to more than mere preparation towards kidnapping Braxlynn.

The medical testimony introduced at trial showed that Appellant's crude C-section appeared to be designed to secure a live baby. Dr. Scales testified that the C-section did not harm Braxlynn and was not poorly performed. Dr.

---

[2] Appellant highlights several pieces of evidence to argue that "the[] evidence was insufficient to allow a reasonable juror to conclude that Braxlynn was born alive." Appellant emphasizes that Braxlynn's "weak pulse" was only attributable to "external efforts to stimulate life," and that "Dr. Herron testified that he never witnessed independent life." "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination." *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). In Appellant's case, the jury was presented with competing evidence and resolved the conflicts in that evidence in the State's favor.

Flores, the medical examiner, testified that Reagan's injuries were focused on the upper body, particularly the head and neck areas. A juror could infer from this testimony that Appellant's assault was directed *away from* the location of the baby in an attempt to avoid harm to the baby while Appellant murdered Reagan.

The evidence admitted at trial also circumstantially proved that Appellant wanted a live baby. The State introduced evidence that Appellant was unable to get pregnant due to a hysterectomy and faked a pregnancy with Griffin in order to keep him in their relationship. Moreover, the jury heard evidence that Appellant purchased a silicone moon belly online as well as a customized ultrasound, prepared a nursery in Griffin's home, had a maternal photoshoot, held a gender reveal party, and chose a name for the baby, all to further the story of the fake pregnancy. A rational juror could conclude based on this evidence that Appellant intended to kidnap Braxlynn alive to complete the fake pregnancy story.

In sum, the evidence was sufficient for a rational juror to conclude that Appellant was attempting to kidnap Braxlynn: Appellant's crude C-section was an act that amounted to "more than mere preparation" that tended to effect a kidnapping. Even if Braxlynn was not "born and is alive," Appellant simply failed to effect the commission of the offense of kidnapping. "Although commission of 'the last proximate act' needed for the crime would of course

constitute an attempt, we have concluded that the legislature did not intend to draw the imaginary line that close to the offense." *Swenson*, 707 S.W.3d at 302. In the present case, Appellant's C-section was an act that amounted to "more than mere preparation" and was sufficient to support the aggravating element of attempted kidnapping. *See id.*

### d. Conclusion

When viewing the evidence in the light most favorable to the verdict, a rational juror could find, beyond a reasonable doubt, that Braxlynn was "born and is alive" at the time Appellant kidnapped her. *Brooks*, 323 S.W.3d at 912; *McPherson*, 677 S.W.3d at 664; *Jackson*, 443 U.S. at 319. Alternatively, a rational juror could find, beyond a reasonable doubt, that Appellant attempted to kidnap Braxlynn. Consequently, the evidence is sufficient to support Appellant's judgment of conviction for capital murder. Appellant's first point of error is overruled.

## III. Change of Venue

In her second and third points of error, Appellant contends that the trial court erred by denying her motion for change of venue. Specifically, Appellant argues that the trial court erred under the Code of Criminal Procedure (point of error two) and violated her rights under the Due Process Clause (point of error three) by denying her motion for change of venue. We overrule both points of error.

### a. Point of Error 2: Code of Criminal Procedure

"A change of venue may be granted if the defendant establishes that 'there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial.'" *Tracy v. State*, 597 S.W.3d 502, 509 (Tex. Crim. App. 2020) (quoting TEX. CODE CRIM. PROC. art. 31.03). When a defendant seeks a change of venue based on publicity about the case, she must show that the publicity was "pervasive, prejudicial, and inflammatory." *Sandoval v. State*, 665 S.W.3d 496, 508 (Tex. Crim. App. 2022). Widespread publicity by itself is not considered inherently prejudicial. *Tracy*, 597 S.W.3d at 509 (citing *Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006)). "The defendant must show an actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which members of the jury will come." *Sandoval*, 665 S.W.3d at 508. We review a trial court's ruling on a motion to change venue for abuse of discretion and will uphold the trial court's decision if it is within the zone of reasonable disagreement. *Id.* The two primary means of discerning whether publicity is pervasive are the hearing on the motion to change venue and the testimony of veniremembers at voir dire. *Id.*; *Tracy*, 597 S.W.3d at 510.

In *Tracy*, this Court reviewed a challenge to the denial of a motion for change of venue in a death penalty case originating from Bowie County—the same county that Appellant's case originates from. 597 S.W.3d at 509–11. The

defendant in *Tracy* murdered a correctional officer at the Barry B. Telford Unit in New Boston, Texas. *Id.* at 507–08. On appeal, the defendant argued that "there was excessive and prejudicial pretrial publicity in Bowie County, and that the Telford Unit, where Officer Davison was employed, is an important economic entity in Bowie County, creating a likelihood that a fair and impartial trial would be impossible." *Id.* at 509. The defendant filed a motion for change of venue supported by two affidavits. *Id.* The State filed contravening affidavits in its response to the motion. *Id.* At a hearing on the motion, the defendant called Brent McQueen, a fact investigator for the defense. *Id.* The State called two witnesses in rebuttal: Bowie County Judge James Carlow and Bowie County Precinct Two Commissioner, Tom Whitten. *Id.* We concluded:

> Testimony at the hearing supports the conclusion that the media coverage was not extensive, inflammatory, or prejudicial. Although there were a number of print and digital newspaper articles and social media posts relating to the case, there was no estimate of how many people in Bowie County actually received or read those articles. A large part of the testimony related to comments made on the articles online, shares on personal Facebook pages, and other reactions on social media pages such as "likes" in response to the articles being posted online. But testimony also showed that many of the people commenting, posting, and responding to the articles were not even Bowie County residents, and would not be in the jury pool.

> Furthermore, news stories that are accurate and objective in their coverage are generally considered by this Court not to be prejudicial or inflammatory. Appellant complains of articles that accurately depict the incident in which Officer Davison was killed. They are not, viewed as a whole, inflammatory and prejudicial.

> The media coverage was not pervasive, prejudicial, or extensive, and it did not permeate the Bowie County community to such an extent that a fair and impartial trial would be impossible. The trial judge acted within the zone of reasonable disagreement in denying the motion to change venue based on the presence of media coverage.
>
> * * *
>
> The record supports the trial court's finding that Appellant could receive a fair trial in Bowie County. We hold that the trial court was within its discretion in denying Appellant's motion to change venue. His second point of error is overruled.

*Id.* at 510.

This case shares similar facts with *Tracy*. Appellant filed a motion for change of venue, supported by her own affidavit and the affidavit of two credible residents of Bowie County. The State opposed the motion with its own contravening affidavits. At a hearing on Appellant's motion, McQueen—the *same investigator* as in *Tracy*—testified about the media coverage in Appellant's case, including news articles in the Texarkana Gazette. Appellant also introduced evidence of comments and interactions on various Facebook groups made by social media users from Bowie County. In rebuttal, the State called three witnesses: Lance Cline, the lead investigator in Appellant's case; Lance Hall, the Bowie County Emergency Management Operator; and Robert Bruggeman, the Mayor of Texarkana. Both Hall and Bruggeman testified that they believed without a doubt that a fair and impartial jury could be seated in Bowie County. Hall also testified that the reporting was "accurate." And

Bruggeman testified that the Gazette required a subscription, so members of the public without a subscription would not be able to access the Gazette's articles.

Like in *Tracy*, the record establishes that the "media coverage was not pervasive, prejudicial, or extensive, and it did not permeate the Bowie County community to such an extent that a fair and impartial trial would be impossible." 597 S.W.3d at 511. "The trial judge acted within the zone of reasonable disagreement in denying the motion to change venue based on the presence of media coverage." *Id.* Consequently, we cannot say that the denial of Appellant's motion to change venue was an abuse of discretion. *Sandoval*, 665 S.W.3d at 508. Appellant's second point of error is overruled.[3]

---

[3] To the extent that Appellant asserts that "80% of the potential jurors had heard about the case," this assertion does not change the outcome. As we noted in *Gonzalez v. State*:

> [T]his Court and other appellate courts have found trial courts within their discretion when they seated panels where 69 veniremembers out of 109 had seen publicity on the accused's case, where 44 out of 72 had seen publicity on the defendant's case, and where 52 panelists out of 64 had seen something on the defendant's case. Likewise, we have found trial courts within their discretion when they seated juries where 15 veniremembers out of 77 stated that they had an opinion that could not be set aside, and where 39 out of 112 held that same view.

222 S.W.3d 446, 450 (Tex. Crim. App. 2007) (internal citations omitted). In *Gonzalez*, "out of 180 members on the panel, 121 were familiar with the case, and 58 had formed an opinion that they would not be able to set aside." *Id.* Yet, we emphasized that the pre-trial publicity was "accurate and objective" and found no abuse of discretion. *Id.* at 452. That a large majority of the Appellant's venire panel had heard about Appellant's case does not render the pretrial publicity "so prejudicial and

### b. Point of Error 3: Due Process Clause

The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury. *Skilling v. United States*, 561 U.S. 358, 377 (2010). In *Rideau v. Louisiana*, the Supreme Court of the United States addressed a due process challenge to the denial of a motion for change of venue. 373 U.S. 723, 724, 727 (1963). After Rideau's arrest, "a moving picture film with a sound track was made of an 'interview' in the jail between Rideau and the Sheriff of Calcasieu Parish." *Id.* at 724. This twenty-minute interview, which "consisted of interrogation by the sheriff and admissions by Rideau that he had perpetrated the bank robbery, kidnapping, and murder . . . was broadcast over a television station in Lake Charles, and some 24,000 people in the community saw and heard it on television." *Id.* "The sound film was again shown on television the next day to an estimated audience of 53,000 people. The following day the film was again broadcast by the same television station, and this time approximately 20,000 people saw and heard the 'interview' on their television sets." *Id.* The trial court denied Rideau's motion for change of venue and the Supreme Court of Louisiana affirmed. *Id.* at 725.

The Supreme Court of the United States reversed. *Id.* at 727. The Supreme Court explained that, "[w]hat the people [in the community] saw on

---

inflammatory that the trial court's decision to deny a change of venue was outside the zone of reasonable disagreement." *Id.* at 451.

their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff." *Id.* at 725. "[T]o the tens of thousands of people who saw and heard it, in a very real sense *was* Rideau's trial—at which he pleaded guilty." *Id.* at 726 (emphasis added). Consequently, the "kangaroo court proceedings" that followed violated due process. *Id.* at 726–27.

Similarly, in *Estes v. Texas*, pre-trial publicity in effect caused "a bombardment of the community with the sights and sounds of a two-day hearing during which the original jury panel, the petitioner, the lawyers and the judge were highly publicized." 381 U.S. 532, 538 (1965). This excessive report "led to considerable disruption," and denied Estes the "judicial serenity and calm to which [he] was entitled." *Id.* at 536. And in *Sheppard v. Maxwell*, "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard." 384 U.S. 333, 353 (1966). This, in effect, put jurors "into the role of celebrities." *Id.* at 355. In the Supreme Court's view, the "carnival atmosphere" was sufficient to upset due process. *Id.* at 358.

The parties analyze this case under the "four factors relevant to presuming prejudice" found in *United States v. Casellas-Toro*, 807 F.3d 380, 386 (1st Cir. 2015). *See also Skilling*, 561 U.S. at 379, 382–384.

### i.    Size of the Community

As we recognized in *Tracy*, "there are approximately 100,000 residents in Bowie County." 597 S.W.3d at 511.[4] This population size is similar to Calcasieu Parish in *Rideau* which had a "population of approximately 150,000 people." 373 U.S. at 724. But the key difference between this case and *Rideau* is the breadth of dissemination of the media. In *Rideau*, the three broadcasts reached "24,000," "53,000," and "20,000 people." *Id.* A similar level of dissemination is not in the record here. Consequently, even though the size of the community in Appellant's case is similar to that in *Rideau*, this factor weighs against a finding of presumed juror prejudice.

### ii.    Nature of the Publicity

Appellant relies on two separate articles by the Texarkana Gazette and TXK Today that included references to Appellant allegedly confessing to law enforcement to argue that the pre-trial publicity in Appellant's case included "evidence of the smoking-gun variety" that would have "invited prejudgment of [her] culpability." *Skilling*, 561 U.S. at 383. Appellant further argues that the "community commentary" on Facebook "revealed a widespread animosity in Bowie County toward [Appellant]." We disagree. First, widespread publicity itself is not considered inherently prejudicial. *Tracy*, 597 S.W.3d at 509.

---

[4] As of the 2020 census, the population of Bowie County was 92,893.

Appellant does not challenge the accuracy of the news articles. As this Court has held, "news stories that are accurate and objective in their coverage are generally considered by this Court not to be prejudicial or inflammatory." *Id.* at 510 (citing *Gonzalez*, 222 S.W.3d at 451). Second, as we also recognized in *Tracy*, testimony "showed that many of the people commenting, posting, and responding to the articles were not even Bowie County residents, and would not be in the jury pool." 597 S.W.3d at 510. Third, while Appellant highlights individual inflammatory comments on Facebook posts, as was admitted in evidence, there were more non-prejudicial comments and posts. And, as Appellant's expert conceded, he did not investigate the actual identities of any of the individuals commenting or posting on social media websites. For the reasons stated above, the mere fact that each newspaper ran articles or that certain individuals commented or posted on Facebook does not correlate to wide-spread dissemination in Bowie County. Appellant argues that "the combined Facebook following" of each newspaper accounts for approximately "135% of the county's population." But there is no record evidence—unlike in *Rideau*—to support the assertion that even a portion of that viewership read the articles. The same is likewise true to the extent Appellant relies on Facebook or other social media sources. There is no evidence in the record that those sources were pervasively shared to the same level as in *Rideau*. This factor weighs against a finding of presumed juror prejudice.

*iii.    Time Between Media Attention and Trial*

Appellant argues that the gap between the offense and Appellant's trial—a gap of less than two years—is not similar to the four-year gaps that were recognized in *Rideau*, 373 U.S. at 724, and in *Patton v. Yount*, 467 U.S. 1025, 1025–26 (1984), as sufficient to diminish the effect of pre-trial publicity. But a period of "nearly two years" has been recognized by other courts as sufficient to "allow[] the decibel level of publicity about the crime themselves to drop and community passions to diminish." *In re Tsarnaev*, 780 F.3d 14, 22 (1st Cir. 2015) (Boston Marathon bombings case). Conversely, McQueen testified at the change-of-venue hearing that "[m]ost cases don't have anywhere near the coverage [that] this case" received during that two-year period. In light of all of the evidence in the record, this factor is neutral as to presuming juror prejudice.

*iv.    Does the Jury's Decision Indicate Bias?*

"In *Rideau, Estes,* and *Sheppard,* . . . the jury's verdict did not undermine in any way the supposition of juror bias." *Skilling*, 561 U.S. at 383 (2010). The defendants in those cases were convicted. In *Skilling*, by contrast, the "jury acquitted [Skilling] of nine insider-training counts." *Id.* The Supreme Court observed that "[i]t would be odd for an appellate court to presume prejudice in a case in which the jurors' actions run counter to that presumption." *Id.* Appellant's jury convicted her of the charged offense and

sentenced her to death. Consistent with *Rideau*, *Estes*, and *Sheppard*, this factor weighs in favor of presuming juror prejudice.

###### v. *Conclusion*

We conclude that the *Skilling* factors weigh against a presumption of juror prejudice. While Appellant's jury did convict her of capital murder, this case does not bear the same hallmarks as *Skilling*, *Estes*, or *Sheppard* where the Supreme Court recognized extensive and prejudicial pre-trial publicity. The record shows that Appellant's trial did not suffer from the "grossly brutal kangaroo court proceedings" that infected the trials in those other cases. *See Rideau*, 373 U.S. at 726. Appellant's third point of error is overruled.

## IV. Motion for Continuance

In her fourth through sixth points of error, Appellant challenges the trial court's denial of her pre-trial motion for continuance. Specifically, Appellant argues that the trial court's denial of her motion for continuance violated: (1) her right to counsel under the Sixth Amendment of the United States Constitution and Article 1, Section 10, of the Texas Constitution (point of error four); (2) her right to due process under the Fourteenth Amendment of the United States Constitution and Article 1, Section 19, of the Texas Constitution (point of error five); and (3) her rights under Article 29.03 of the Code of Criminal Procedure (point of error six). We overrule each point of error.

Article 29.03 of the Code of Criminal Procedure provides:

A criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion. A continuance may be only for as long as is necessary.

TEX. CODE CRIM. PROC. art. 29.03. "All motions for continuance *must be sworn to* by a person having personal knowledge of the facts relied on for the continuance." *Id.* art. 29.08 (emphasis added).

"We have construed these statutes to require a sworn written motion to preserve appellate review from a trial judge's denial of a motion for a continuance." *Anderson v. State*, 301 S.W.3d 276, 279 (Tex. Crim. App. 2009) (collecting authorities). "Thus, if a party makes an unsworn oral motion for a continuance and the trial judge denies it, the party forfeits the right to complain about the judge's ruling on appeal." *Id.* We have also "explicitly refused to recognize a due process exception to the rule requiring motions for continuances to be written and sworn in order to be preserved on appeal." *Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012) (citing *Anderson*, 301 S.W.3d at 280).

Pre-trial, Appellant filed a written motion for continuance. But the motion was not sworn to by Appellant in either a verification or an affidavit. Instead, Appellant relies on four *ex parte* affidavits from witnesses that Appellant attached to her motion for continuance filed in the trial court. None

of these *ex parte* affidavits were included in the appellate briefing. To the extent that Appellant asserts that the *ex parte* affidavits are sufficient to preserve error, Appellant has inadequately briefed this argument. *See* TEX. R. APP. P. 38.1(i). Appellant conclusorily asserts: "These declarations—from a mitigation specialist, two experts, and an investigator—satisfy Article 29.08." At no point does Appellant explain why her unsworn motion with sworn affidavits satisfies Article 29.08; she simply asserts that it does. Resolving this preservation-of-error issue in Appellant's favor would therefore require us to make Appellant's argument for her. This we will not do. *See Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex. Crim. App. 1995). We overrule Appellant's fourth through sixth points of error.

## V.    Extraneous Offenses

In her seventh through eleventh points of error, Appellant challenges the admission of extraneous offense evidence during her trial. In her seventh point of error, Appellant contends that the trial court erred in admitting extraneous offense evidence without reasonable notice. In her eighth point of error, Appellant argues that the extraneous offense evidence was inadmissible under Rule of Evidence 404(b) and that the admission of the evidence affected her substantial rights. In her ninth point of error, Appellant claims that the introduction of evidence unrelated to the Article 37.071 special issues during the penalty phase of trial affected her substantial rights. In her tenth point of

error, Appellant argues that the introduction of excessive extraneous offense testimony violated her right to a fair trial. And in her eleventh point of error, Appellant contends that the introduction of evidence invoking gender stereotypes violated due process. We overrule each point of error.

### a. Point of Error 7: Notice

Rule of Evidence 404(b) states that "the prosecutor must provide reasonable notice before trial that the prosecution intends to introduce such evidence—other than that arising in the same transaction—in its case-in-chief." TEX. R. EVID. 404(b)(2). "The 'spirit' of Rule 404(b) is to allow a defendant adequately to prepare to defend against the extraneous offense evidence." *Hayden v. State*, 66 S.W.3d 269, 273 n.16 (Tex. Crim. App. 2001).

> Rule 404(b) does not set forth a formalistic method for conveying notice and does not require a writing. While the State should not be permitted to engage in gamesmanship by finding creative ways to convey "notice" without really informing the defense of its intent to introduce extraneous offenses, the defense should not be permitted to engage in gamesmanship by claiming the notice it received was insufficient when the defense did in fact have actual notice of the State's intent to introduce the extraneous offenses in question.

*Id.* We have emphasized that the purpose of Rule 404(b) is to prevent surprise. *Id.* at 272; *see also Hernandez v. State*, 176 S.W.3d 821, 823–25 (Tex. Crim. App. 2005).

Assuming, without deciding, that error was preserved, we conclude that there was no error. The State's first notice of intent to use extraneous offenses

was over one hundred pages in length and was served three months prior to the start of trial. The State's three supplemental notices of intent to use extraneous offenses likewise lengthily described additional extraneous acts that occurred during Appellant's pre-trial incarceration and were served between one and two months prior to trial. Tellingly, Appellant's trial counsel did not argue surprise when the trial court granted him a running objection under Rule 404(b).[5] The record in this case "tends to support the conclusion that the defense did indeed have actual notice of the State's intent to introduce the extraneous offenses, and hence, the trial court's decision to admit the evidence is supported by the record and must be upheld." *Hayden*, 66 S.W.3d at 273 n.16. Appellant's seventh point of error is overruled.

### b. Point of Error 8: Rule 404(b) Admissibility

Rule of Evidence 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R.

---

[5] The focus of Appellant's renewed motion for adequate notice of extraneous offenses was not adequate notice of the acts themselves but rather notice of the specific exceptions under Rule 404(b) that the State would seek to introduce each extraneous offense under.

EVID. 404(b)(2). "The exceptions listed under Rule 404(b) are neither mutually exclusive nor collectively exhaustive." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (collecting authorities). "Rule 404(b) is a rule of inclusion rather than exclusion." *Id.* "The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *Id.* (citing *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996) ("[I]f evidence (1) is introduced for a purpose other than character conformity, (2) has relevance to a 'fact of consequence' in the case and (3) remains free of any other constitutional or statutory prohibitions, it is admissible").

"The admissibility of evidence is within the discretion of the trial court and will not be overturned absent an abuse of discretion." *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). "That is to say, as long as the trial court's ruling was within the zone of reasonable disagreement, the appellate court should affirm." *Id.* A trial court's ruling will generally be upheld "if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury." *De La Paz*, 279 S.W.3d at 344.

In her briefing, Appellant challenges four pieces of admitted extraneous offense evidence: (1) evidence that Appellant asked witnesses "to be surrogates

for six-figure compensation"; (2) evidence that Appellant "claimed to be the heiress to a syrup fortune and entered contracts to buy large amounts of land"; (3) evidence that Appellant "is 'normal,' has no mental health issues, and simply chooses to lie when she wants to"; and (4) evidence of "a particularly strange tale [that Appellant] supposedly spun about her mother hiring the Mexican Mafia to kill her." We address each in turn.

### i.    *Surrogacy*

At trial, the State introduced evidence from Abby Bell and Micayla Curtis, who both testified that Appellant asked them to be surrogates in exchange for money. The trial court could have reasonably concluded that this evidence was admissible as evidence of Appellant's motive and intent. The evidence at trial showed that Appellant underwent a hysterectomy that was authorized by her then-husband Wacasey, due to medical complications during an ectopic pregnancy. After she divorced Wacasey and married Parker, she was unable to get pregnant and sought surrogates because she wanted more children. That Appellant could not get pregnant and needed surrogates was relevant to Appellant's fake pregnancy and efforts to keep her and Griffin together in a relationship. It was within the zone of reasonable disagreement for the trial court to conclude that the surrogacy evidence was admissible for the permissible purpose of establishing Appellant's motive and intent for murdering Reagan and kidnapping Braxlynn. *Moses*, 105 S.W.3d at 627.

### ii. Heiress to a syrup fortune

The State introduced evidence from Rusty Lowe, a real estate broker with Century 21 Harvey Properties in Paris, Texas. Lowe testified that in December 2019, a woman identifying herself as Taylor Parker or Taylor Griffin called him inquiring about a 1500-acre tract of land on the right edge of Bowie County valued at approximately 4.7 million dollars. Lowe testified that when he asked Appellant how she was going to pay for the property, she responded that "she was the heir to a syrup company." The trial court could have reasonably concluded that this evidence was admissible as evidence of Appellant's motive. After having been rejected by the men in her life, the State sought to prove that Appellant did not want to lose her newest boyfriend, Griffin, whom she began dating after her 2019 divorce from Parker. These efforts to "keep" Griffin culminated in a faked pregnancy that eventually led to the deaths of Reagan and Braxlynn. It was within the zone of reasonable disagreement for the trial court to conclude that the evidence of Appellant lying about her status as heir to a syrup company fit within her scheme to "keep" Griffin and consequently was evidence of her eventual motive to murder Reagan and kidnap Braxlynn. *Moses*, 105 S.W.3d at 627.

### iii. The Mexican Mafia

At trial, the State called Angela Pate, whose husband is a distant relative of Griffin's. Pate spent a lot of time with Appellant, and Appellant told Pate

stories about her life. One such story involved Appellant's mother Prior, who "didn't like Wade." According to Appellant, Prior hired the Mexican Mafia to kill Appellant. Contextually, Appellant created this story immediately after she and Griffin "got in a tiff" at a party and stayed separate for a few days. Pate testified that "Wade, as he was listening to [Appellant], felt he couldn't leave her with all this going on with her mother, and so they were back together after that." The trial court could have reasonably concluded that this evidence was admissible as evidence of Appellant's motive. As with the other extraneous offense evidence, this story again exhibited the lengths to which Appellant went to keep Griffin in their relationship. It was within the zone of reasonable disagreement for the trial court to conclude that the evidence that Appellant lied about her mother taking a hit out on her with the Mexican Mafia fit within her scheme to "keep" Griffin and consequently was evidence of her eventual motive to murder Reagan and kidnap Braxlynn. *Moses*, 105 S.W.3d at 627.

*iv.    Appellant lies when she wants to and was "normal"*

At trial, the State introduced testimony from DeAnna Parker, Hunter Parker's mother, and Bobby Jordan, the interim police chief for the City of Texarkana. On direct examination by the State, DeAnna Parker testified:

Q.    So she knows when she's lying?

A.    Absolutely. Yes, she does.

Jordan testified:

> Q.    Did she seem normal? That's the word they've been using. Did it seem pretty normal to you?
>
> A.    She seemed normal.

Rule of Appellate Procedure 44.2(b) provides that an appellate court must disregard a non-constitutional error that does not affect a criminal defendant's "substantial rights." TEX. R. APP. P. 44.2(b). "Under that rule, an appellate court may not reverse for non-constitutional error if the court, after examining the record as a whole, has fair assurance that the error did not have a substantial and injurious effect or influence in determining the jury's verdict." *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004) (first citing *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998), then citing *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)). Jordan's testimony that Appellant was "normal" had no effect on the outcome of the trial. And DeAnna Parker's testimony that Appellant knows when she is lying was cumulative of numerous other instances of evidence that was presented to the jury that showed Appellant lying. There was ample evidence substantiating Appellant's guilt regarding her commission of the murders. After examining the record as a whole, we have more than a "fair assurance" that the admission of both lines of questioning did not have a substantial and injurious effect on the jury's verdict. *See id.*

Having reviewed the evidence that Appellant challenges in her briefing, we conclude that there was no trial court error or that, presuming error, we have more than a fair assurance that the error did not have a substantial and injurious effect on the jury's verdict.[6] Appellant's eighth point of error is overruled.

### c. Point of Error 9: Article 37.071 Admissibility

The admissibility of extraneous offense evidence offered at punishment is governed by Code of Criminal Procedure Article 37.071, Section 2(a). TEX. CODE CRIM. PROC. art. 37.071, § 2(a) ("In the [capital sentencing] proceeding, evidence may be presented by the state and the defendant or the defendant's counsel as to any matter that the court deems relevant to sentence, including evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty."). This article has been construed to afford the trial judge wide latitude in admitting or excluding evidence of extraneous offenses at the punishment stage of a capital trial. *Kemp v. State*, 846 S.W.2d 289, 307 (Tex. Crim. App. 1992). The

---

[6] To the extent that there was other evidence that Appellant could challenge on appeal, this Court "is under no obligation to make appellant's arguments for her." *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011); *see also Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008); *Proctor v. State*, 967 S.W.2d 840, 845 (Tex. Crim. App. 1998).

trial court's determination of admissibility is evaluated for abuse of discretion. *Hughes v. State*, 24 S.W.3d 833, 843 (Tex. Crim. App. 2000).

In her briefing, Appellant contends that four pieces of extraneous offense evidence that were admitted during punishment were "in no way relevant to the future danger special issue."

First, Appellant challenges the admission of evidence that Appellant sold a former co-worker some bread for Appellant's kids' school fundraiser but failed to deliver the bread. At punishment, the State introduced evidence from Nona Ahyosgi, Appellant's former co-worker at Genesis Prime Care. Ahyosgi testified that she purchased $14 of bread from Appellant through the fundraiser, but after Appellant was terminated from her job, Appellant never delivered Ahyosgi the bread or returned Ahyosgi's money. It was within the zone of reasonable disagreement for the trial judge to conclude that evidence that Appellant committed theft was relevant to the future dangerousness special issue. *See* TEX. R. EVID. 401, 402; *see also* TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1).

Next, Appellant challenges evidence "that she claimed to be an heiress of the Morton salt fortune." At trial, the State elicited testimony from Melissa Mason, Appellant's former supervisor, who testified about Appellant's history of untruthfulness. Appellant's claim to Mason that Appellant was "an heiress of the Morton salt fortune"—a lie about her family background told to an

employer—also arguably related to the future dangerousness special issue because it fit within the State's theory at trial that Appellant had a propensity for not telling the truth due to her psychopathic traits. *See* TEX. R. EVID. 401, 402; *see also* TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1); *see also infra* at part VIII.b.*ii.* (discussing testimony that Appellant had a propensity "to claim things to manipulate regarding finances to her benefit" was linked to her psychopathic traits).

Lastly, Appellant challenges "evidence that [Appellant] once cursed at her grandmother as a teenager" and evidence "that she asked for a bigger desk at work." As before, the admission of evidence is reviewed for harmless error under Rule of Appellate Procedure 44.2(b). TEX. R. APP. P. 44.2(b). The gruesome nature of the crime and the State's additional punishment phase evidence provided ample evidence to support the jury's answers to the special punishment issues. After examining the record of Appellant's trial as a whole, we conclude that these passing references did not have a substantial and injurious effect or influence on the jury's verdict at the punishment phase. *See id.*

Having reviewed the challenged evidence in Appellant's briefing, we conclude that there was either no trial court error, or that, presuming error, we have more than a fair assurance that the error did not have a substantial

and injurious effect on the jury's verdict.[7] Appellant's ninth point of error is overruled.

### d. Point of Error 10: Excessive Extraneous Offense Testimony

Appellant's tenth point of error claims that the introduction of "excessive" extraneous offense evidence violated her right to a fair trial. But instead of pointing this Court to a specific objection at trial regarding excessiveness or case law from this Court recognizing that excessiveness is a bar to the admissibility of Rule 404(b) evidence, Appellant instead argues that the "circumstances of the extraneous offense evidence—from inadequate notice, to introduction of impermissible character evidence in the guilt phase, to admission of evidence irrelevant to the special issues in penalty phase— violated [Appellant's] right to a fair trial."

"[T]o preserve error, a party must 'let the trial judge know what he wants' as well as giving a reason for being entitled to relief." *Crawford v. State*, 710 S.W.3d 774, 785 (Tex. Crim. App. 2025) (citing *Ex parte Nuncio*, 662 S.W.3d 903, 914 (Tex. Crim. App. 2022)); *see also* TEX. R. APP. P. 33.1(a). Appellant never objected to the trial court on the basis of excessiveness. Consequently, error was not preserved for appellate review. Alternatively, if

---

[7] As with Appellant's eighth point of error, to the extent that there was other evidence that Appellant could challenge on appeal, this Court "is under no obligation to make appellant's arguments for her." *Lucio*, 351 S.W.3d at 896; *see also Busby*, 253 S.W.3d at 673; *Proctor*, 967 S.W.2d at 845.

we take Appellant's arguments at face value, having already overruled points of error seven through nine, Appellant's challenge to the "circumstances of the extraneous offense evidence" in her tenth point of error is without merit. Appellant's tenth point of error is overruled.

### e. Point of Error 11: Gender Stereotypes

In her eleventh point of error, Appellant argues that "[t]he introduction of evidence invoking gender stereotypes violated due process." But Appellant failed to object on that basis in the trial court, so error was not preserved. There were no objections at trial to any evidence on the basis that the evidence "invok[ed] gender stereotypes" in violation of "due process."[8] Consequently, Appellant did not preserve any error for appellate review. *Crawford*, 710 S.W.3d at 785. Appellant's eleventh point of error is overruled.

## VI. Admission of Other Evidence

In her twelfth through eighteenth points of error, Appellant contends the trial court erred by admitting various pieces of evidence. Specifically,

---

[8] Appellant argues that she preserved error through her tangential reference to "legal, non-criminal acts that the State apparently deems to be morally transgressive or simply inappropriate" in her second motion for notice of extraneous offenses. That argument fails for three reasons. First, at no point in that motion does Appellant seek to exclude extraneous offense testimony on the basis that "[t]he introduction of evidence invoking gender stereotypes violated due process." Second, as we noted previously, that motion was tailored to seeking notice of the Rule 404(b) exceptions under which the State would attempt to introduce each piece of extraneous offense evidence. Third, Appellant's pre-trial oral motion also failed to raise a gender stereotyping objection.

Appellant challenges the admission of: (1) a recorded 9-1-1 call made by Reagan's mother, Jessica Brookes (point of error twelve); (2) twenty-eight crime scene photographs (point of error thirteen); (3) a video of Reagan's body (points of error fourteen and fifteen); (4) sixty-two photographs of Reagan's autopsy (point of error sixteen); (5) three photographs of Braxlynn's autopsy (point of error seventeen); and (6) two additional photographs of the deceased infant (point of error eighteen). Appellant also contends that the cumulative effect of the errors affected her substantial rights in both the guilt and punishment phases of her trial. We overrule each of Appellant's points of error.

### a. Point of Error 12: Admissibility of the 9-1-1 call

In her twelfth point of error, Appellant contends that "the trial court admitted a recorded 911 call made by decedent's mother, Jessica Brookes, that served no purpose beyond demonstrating her devastation at the loss of her daughter and unborn granddaughter." Appellant further asserts that the probative value of the 9-1-1 call was outweighed by its prejudicial effect.

We have already rejected a similar challenge. *See Estrada v. State*, 313 S.W.3d 274, 300 (Tex. Crim. App. 2010). In *Estrada*, the appellant challenged the "introduction of an inflammatory and repetitive 911 recording of Sanchez's family members upon discovering her body" because the "9-1-1 recording was 'extremely prejudicial.'" *Id.* We explained that "evidence such as this is admissible at the guilt phase to provide a framework within which the

particulars of the State's evidence could be developed even though the evidence did not of itself establish any material fact not otherwise proven in the balance of the State's case." *Id.* (quoting *Webb v. State*, 760 S.W.2d 263, 276 (Tex. Crim. App. 1988)) (internal quotation marks omitted).

In Appellant's case, like in *Estrada*, Brookes discovered Reagan's body and reported the crime. Consequently, her recorded 9-1-1 call was admissible "to provide a framework within which the particulars of the State's evidence could be developed." *Id.* Appellant's twelfth point of error is overruled.

**b. Points of Error 13 & 16–18: Admissibility of photographs**

As with other admissibility decisions, we review a trial court's decision to admit or exclude photographic evidence for abuse of discretion. *Davis v. State*, 313 S.W.3d 317, 331 (Tex. Crim. App. 2010) (citing *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995)) ("The admissibility of photographs over an objection is within the sound discretion of the trial court."). A photograph is generally admissible if verbal testimony about the matters depicted in the photograph is also admissible. *Paredes v. State*, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004) (citing *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997)).

*i.     Point of Error 13 — Crime Scene Photographs*

Rule of Evidence 403 provides that a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . .

unfair prejudice." TEX. R. EVID. 403. In her thirteenth point of error, Appellant argues that "[t]he trial court erred in admitting 28 of the 137 crime-scene photographs, which were substantially more prejudicial than probative in violation of Rule 403."[9]

State's Exhibits 236–38, 240, 242, and 244 offer wide view panoramic shots of the crime scene from different angles. State's Exhibits 298–300 depict various pieces of furniture around the crime scene, as well as the spread of blood and footprints. State's Exhibit 298 and 299 specifically depict a pillow and towels covered in blood. And State's Exhibits 355 through 374 depict the injuries inflicted on Reagan's body as well as the spread of blood around Reagan's body.

As we have previously recognized, "[t]he photographs in question were probative of the crime scene and the injuries received by the victim, were necessary for the State in developing its case, and, because they were not overly gruesome, the photographs did not pose the potential of impressing the jury in some irrational way." *Shuffield v. State*, 189 S.W.3d 782, 788 (Tex. Crim. App. 2006). Furthermore, the gruesomeness of the crime that merely reflects the actions of the defendant "is not a sufficient reason for excluding the

---

[9] Having reviewed the record, Appellant appears to have preserved error as to 29 crime-scene photographs, instead of 28. In fact, in her reply brief, Appellant includes citations to 29 exhibits. We can only surmise that the reference to 28 exhibits in Appellant's opening brief on the merits was a typographical error.

evidence." *Ripkowski v. State*, 61 S.W.3d 378, 392 (Tex. Crim. App. 2001). Consequently, the trial court's decision to admit the crime scene photographs was within the zone of reasonable disagreement and was not an abuse of discretion. *Davis*, 313 S.W.3d at 331. We overrule Appellant's thirteenth point of error.

## ii. Points of Error 16 & 17 — Autopsy Photographs

Appellant argues that "the trial court admitted a lengthy series of photographs that focused on the autopsy process rather than the injuries inflicted during the offense." "Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself." *Id.* (citing *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997)). "Changes rendered by the autopsy process are of minor significance if the disturbing nature of the photograph is primarily due to the injuries caused by the appellant." *Hayes v. State*, 85 S.W.3d 809, 816 (Tex. Crim. App. 2002) (citing *Santellan*, 939 S.W.2d at 173).

The challenged exhibits in Appellant's sixteenth point of error depict the full extent of Reagan's fatal injuries, including stab wounds and incisions to her face and neck, evidence of possible strangulation, and blunt-force skull fractures. That some photographs depict the autopsy process is of little import—these changes were necessary to show the jury the full scope of the internal injuries that Reagan suffered from Appellant's assault. This evidence

is highly probative of Appellant's mental state at the time she committed the crime, which in turn is relevant to the future dangerousness special issue. *See Young v. State*, 283 S.W.3d 854, 864 (Tex. Crim. App. 2009) ("[E]vidence of such a callous crime might alone support a finding of future dangerousness.").

Likewise, the challenged exhibits in Appellant's seventeenth point of error depict the injuries that Braxlynn suffered, including evidence of "focal subscapular hemorrhage." The medical examiner testified that this type of injury could be consistent with the infant's mother being hit in the stomach while the infant was still *in utero*. Furthermore, the photographs depict evidence of hemorrhaging involving the umbilical cord, which could also potentially be caused by some sort of blunt trauma. Like the evidence in Appellant's sixteenth point of error, this evidence is highly probative of Appellant's mental state at the time she committed the crime, which in turn is relevant to the future dangerousness special issue. *See id.*

Consequently, the trial court's decision to admit the autopsy photographs was within the zone of reasonable disagreement and was not an abuse of discretion. *Davis*, 313 S.W.3d at 331. We overrule Appellant's sixteenth and seventeenth points of error.

### iii. *Point of Error 18 — Additional Photographs of Braxlynn*

In her eighteenth point of error, Appellant contends the trial court abused its discretion by admitting two photographs of Braxlynn after she was

recovered by paramedics and transported to the hospital. The photographs depicted the "as-is" state that Braxlynn was in immediately after Appellant's crude C-section and prior to her later autopsy. The trial court could have reasonably concluded that the photographs were relevant to offer the jury a comprehensive view of Braxlynn's condition and to assist in its determination that Braxlynn was "born and is alive" at the time she was kidnapped. As with the autopsy photographs, the trial court could have also reasonably concluded that the additional photographs of Braxlynn were probative of Appellant's mental state at the time of committing the crime, which in turn is relevant to the future dangerousness special issue. *See Young*, 283 S.W.3d at 864. Consequently, the trial court's decision to admit the two photographs of Braxlynn at the hospital was within the zone of reasonable disagreement and was not an abuse of discretion. *Davis*, 313 S.W.3d at 331. We overrule Appellant's eighteenth point of error.

### c. Points of Error 14 & 15: Admissibility of the video

In her fourteenth and fifteenth points of error, Appellant argues that the trial court abused its discretion by admitting "a graphic video of the decedent's body at the crime scene." Specifically, Appellant argues the trial court erred under Rule of Evidence 401 (point of error fourteen) and Rule of Evidence 403 (point of error fifteen) by admitting the video.

Our analysis in *Ripkowski*, 61 S.W.3d at 392, is directly on point:

> We have held in the past that a videotape and still photographs are not entirely cumulative of each other. A videotape offers a panoramic view of the scene that still photographs often do not offer. We have previously upheld the admission of a videotape of the crime scene against a Rule 403 claim that the evidence was unduly cumulative or caused undue delay. We see little difference between the present situation and the facts of our prior case. Although appellant also claims unfair prejudice, we find that the videotape simply reflects the gruesomeness of the crime—and that is not a sufficient reason for excluding the evidence.

*Id.* (internal citations omitted). In Appellant's case, the video evidence in State's Exhibit 250 was the only evidence that provided a live panoramic view of the crime scene, including a live visual of the footprints around the Reagan's body. Furthermore, the video evidence offered a more comprehensive view of Reagan's injuries and how they looked immediately following the murder and prior to law enforcement's investigation. We conclude that the video evidence was relevant and probative. *See* TEX. R. EVID. 401, 403. While we acknowledge that the video depicts a gruesome crime scene, "the videotape simply reflects the gruesomeness of the crime—and that is not a sufficient reason for excluding the evidence." *Ripkowski*, 61 S.W.3d at 392. Consequently, the trial court's decision to admit the video evidence was within the zone of reasonable disagreement and was not an abuse of discretion. *Davis*, 313 S.W.3d at 331.

### d. Cumulative Harm

"Though it is possible for a number of errors to cumulatively rise to the point where they become harmful, we have never found that 'non-errors may

in their cumulative effect cause error.'" *Bluntson v. State*, — S.W.3d —, No. AP-77,067, 2025 WL 1322702, at *15 (Tex. Crim. App. May 7, 2025) (quoting *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009)). Having found no error in Appellant's twelfth through eighteenth points of error, we cannot conclude that there is a cumulative effect of harm.

## VII. Prosecutor Statements

In her nineteenth through twenty-third points of error, Appellant challenges comments made by the prosecutors throughout her trial, as well as testimony elicited by the State through witnesses. Specifically, Appellant alleges: (1) the trial court erred by allowing prosecutors to call Appellant's case "the worst" (point of error nineteen); (2) the trial court erred by allowing the State to elicit testimony from witnesses that this case was "the worst" (points of error twenty and twenty-one); (3) the trial court erred by allowing the State to refer to Appellant using "derogatory names" (point of error twenty-two); and (4) prosecutors committed misconduct by inserting personal knowledge and opinions into Appellant's trial (point of error twenty-three). Appellant also contends that the cumulative effect of the errors affected her substantial rights in both the guilt and punishment phases of her trial. We overrule each of Appellant's points of error.

### a. Points of Error 19–22: Preservation

Pre-trial, Appellant's trial counsel made an oral motion in limine,

requesting:

> that the State be prohibited, as well as any potential witness, from testifying that this is the worst case I've ever seen or anything along those lines, as well as no mention from the State or any witness offering an opinion that the defendant has shown no remorse or that there's a lack of remorse, on a couple of grounds.

Additionally, Appellant's trial counsel filed a pre-trial written motion in limine, requesting the trial Court "prohibit[] the State from engaging in derogatory or dehumanizing name-calling of [Appellant]." The trial court denied both motions in limine before the start of Appellant's trial.

"A motion in limine, however, is a preliminary matter and normally preserves nothing for appellate review. For error to be preserved with regard to the subject of a motion in limine, an objection must be made at the time the subject is raised during trial." *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) (internal citations omitted). The record is devoid of any contemporaneous objections during each of the challenged comments by either the prosecutors or a witness. Consequently, Appellant has failed to preserve her complaints for appellate review. *Irsan*, 708 S.W.3d at 603; *Cockrell*, 933 S.W.2d at 89.

Appellant relies on *Draughon v. State*, 831 S.W.2d 331 (Tex. Crim. App. 1992), and *Geuder v. State*, 115 S.W.3d 11 (Tex. Crim. App. 2003), to argue that her pre-trial motions in limine were not "true" motions in limine. In *Draughon v. State*, the appellant filed a pre-trial motion in limine that sought to prevent

the State from questioning prospective jurors concerning their attitudes about the death penalty. 831 S.W.2d at 333. We concluded that the motion in limine was not a true motion in limine because it did "not constitute a request that the admissibility of evidence or disposition of other matter by the court be determined outside the jury's presence." *Id.* at 333 n.1. Rather, the motion was "sufficient to apprise the trial judge of his complaint, and that the judge's adverse ruling upon it was authoritative enough to obviate the necessity for further objection." *Id.*

In *Geuder*, after the State rested, the defense advised the Court that the defendant intended to testify and, outside of the presence of the jury, objected to the admissibility of the defendant's prior convictions for impeachment purposes. 115 S.W.3d at 14–15. We concluded that the "trial court's ruling was not an adverse ruling on a motion *in limine*," but rather "an adverse ruling . . . in the face of a specific and timely objection." *Id.* at 14 (original italicization).

The same is not true here. Unlike the motions in *Draughon* and *Geuder*, Appellant's pre-trial motions in limine were speculative and did not go to one specific witness or even one definitive category of testimony. Rather, they sought to exclude broad swaths of jury argument or evidence. Without a specific, timely objection to a jury argument or testimony, it would be impossible for the trial court to know whether such argument or evidence fell within the ambit of Appellant's pre-trial motions in limine. *Cf. Luce v. United*

*States*, 469 U.S. 38, 40 & n.2, 41–42 (1984) (indicating that a ruling on a motion in limine is not a final ruling because a trial judge may not be aware of all the pertinent evidence). Moreover, one of the bases for Appellant's pre-trial motions in limine—Rule of Evidence 403—shows why a contemporaneous objection was necessary: Rule 403 requires the trial court to balance the probative value of the evidence to see if that probative value is "substantially outweighed" by one of several, enumerated risks. *See* Tex. R. Evid. 403. A trial court cannot make that determination *pre-trial*, speculating as to what evidence will eventually be introduced and admitted, without having the full scope of the evidence before it. We are unpersuaded by Appellant's arguments and conclude that Appellant's objections were not preserved for appellate review. Consequently, we overrule Appellant's nineteenth through twenty-second points of error.

### b. Point of Error 23: Personal Knowledge or Opinions

The proper method of preserving error in cases of prosecutorial misconduct is to (1) object on specific grounds, (2) request an instruction that the jury disregard the comment, and (3) move for a mistrial. *Penry v. State*, 903 S.W.2d 715, 764 (Tex. Crim. App. 1995) (citing *Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993)).

In her briefing, Appellant cites numerous allegedly objectionable questions asked by the State to witnesses. But Appellant only cites six times a

contemporaneous objection was lodged. As to some questions, Appellant objected, did not receive a ruling, and failed to object to the trial court's refusal to rule. As to other objections, Appellant failed to "request an instruction that the jury disregard the comment" after her objections were sustained. *Id.* And, as to one objection, Appellant failed to "move for a mistrial" after the trial court granted a limiting instruction. *Id.* Consequently, Appellant has failed to preserve her complaints for appellate review. *Id.* We overrule Appellant's twenty-third point of error.

### c. Cumulative Error

Appellant claims that the cumulative error in her nineteenth, twenty-second, and twenty-third points of error harmed her substantial rights during the guilt and penalty phases of trial. Having found no preserved error as to Appellant's nineteenth, twenty-second, and twenty-third points of error, we cannot conclude that there is a cumulative effect of harm. *Bluntson*, — S.W.3d —, No. AP-77,067, 2025 WL 1322702, at *15.

## VIII. State's Penalty-Phase Experts

In her twenty-fourth and twenty-fifth points of error, Appellant contends that the trial court erred by: (1) permitting the State's penalty-phase rebuttal experts to conduct unlimited interviews (point of error twenty-four); and (2) permitting the State's penalty-phase experts to testify beyond the scope of

Appellant's limited waiver of her right against self-incrimination (point of error twenty-five). We overrule both points of error.

### a. Point of Error 24: Scope of Examination

In her twenty-fourth point of error, Appellant specifically argues that the trial court erred by allowing the State's penalty-phase rebuttal experts to conduct standardized psychological assessments, particularly going to "psychopathy."

"[I]f a defendant breaks his silence to speak to his own psychiatric expert and introduces that testimony which is based on such interview, he has constructively taken the stand and waived his fifth amendment right to refuse to submit to the State's psychiatric experts." *Chamberlain v. State*, 998 S.W.2d 230, 234 (Tex. Crim. App. 1999). "[T]he trial court may compel an examination of [the] appellant by an expert of the State's or court's choosing and the State may present rebuttal testimony of that expert based upon his examination of the defendant." *Lagrone v. State*, 942 S.W.2d 602, 610 (Tex. Crim. App. 1997) (quoting *Soria v. State*, 933 S.W.2d 46, 58–59 (Tex. Crim. App. 1996)).

Our prior opinion in *Davis* is directly on point. There, as here, the appellant sought to challenge "the scope of the [*Lagrone*] examination." 313 S.W.3d at 351–52. We held:

> [T]he subject matter of the defense psychiatrist's interview—
> "diminished capacity at the time, mitigating factors that are now
> relevant in terms of the effects of drugs taken, remorse, and

adjustment to incarceration"—are factors that could be taken into account in determining future dangerousness. Appellant's attempt to draw a hairsplitting distinction between these topics and a State expert's ultimate opinion as to future dangerousness is untenable and conflicts with the underlying rationale for the *Lagrone* rule: "[I]f a defendant breaks his silence to speak to his own psychiatric expert and introduces that testimony which is based on such interview, he has constructively taken the stand and waived his fifth amendment right to refuse to submit to the State's psychiatric experts. The focus is the defendant's choice to break his silence."

*Id.* at 352 (internal citation omitted).

The same is true in Appellant's case. The subject matter of Appellant's experts—organic physical defects in her brain, personality disorders, and childhood trauma—"are factors that could be taken into account in determining future dangerousness." *Id.* Indeed, Dr. Edward Gripon, one of Appellant's experts, testified that Appellant's personality was not characterized by criminal violence, and that given her background, there was no strong basis to predict a "probability" that Appellant would pose a future danger. As we did in *Davis*, we decline "to draw a hairsplitting distinction between these topics and a State expert's ultimate opinion as to future dangerousness." *Id.* Appellant's twenty-fourth point of error is overruled.

### b. Point of Error 25: Scope of Rebuttal

In her twenty-fifth point of error, Appellant argues that the trial court erred by permitting Dr. Timothy Proctor, one of the State's rebuttal experts, to testify about (1) the results of the PCL-R "psychopathy checklist" he

administered to Appellant including Appellant's above-average score, and (2) Appellant's purported "psychopathic traits" and potential "full psychopathy."

The State's rebuttal testimony "is limited to the issues raised by the defense expert." *Lagrone*, 942 S.W.2d at 610 (quoting *Soria*, 933 S.W.2d at 58–59). "[I]f a defendant introduces psychiatric evidence in some form, the State may also introduce psychiatric evidence in some form." *Wilkens v. State*, 847 S.W.2d 547, 552 (Tex. Crim. App. 1992) (first citing *Estelle v. Smith*, 451 U.S. 454, 465–66 (1981); then citing *Buchanan v. Kentucky*, 483 U.S. 402, 422 (1987)).

*i.    Evidence*

At trial, Appellant introduced testimony from three experts: (1) Dr. Siddhartha Nadkarni, a neurologist; (2) Dr. Edward Gripon, a psychiatrist; and (3) Laura Elmore, a licensed master social worker.

Dr. Nadkarni testified that Appellant "has atrophy in the frontal and temporal areas" of her brain. Dr. Nadkarni further testified:

> Q.    In her case, would it likely be because of early interference with her development?
>
> A.    That would be my speculation, but it would be — it would be hard to know, but that's — from what this imaging looks like and how long her history is, I would — that would be my — that would be my – that would be my position.
>
> Q.    I think you described it as something that had been going on for a long time?

A. That, I can definitely say, right. I just can't say if it's developmental, like, in utero or not, but it has been going on for a long time.

Q. And the dysfunction affects the way Taylor behaves?

A. A hundred percent, yes.

Based on her analysis of Appellant's MRI slides, Dr. Nadkarni concluded:

Q. So this abnormality affects how a person processes information, from receiving it and then acting on it?

A. That's right. That's the main place where that happens.

Q. From what you know about the case, do you find that Taylor has acted dysfunctionally as far as neurology or her brain is concerned?

A. Yes. She has — she has — she has — she has what we would call a frontal lobe syndrome, I mean, a lot of features of frontal lobe dysfunction.

Q. And it's actually an organic physical defect in her brain?

A. Correct.

Dr. Nadkarni also described "disinhibition"—impulsivity—and "confabulation"—making up stories or being inconsistent—and testified that Appellant suffered from both conditions as a result of her mental atrophy. Dr. Nadkarni opined that these conditions could be mitigated through medications, psychotherapy, group therapy, or supervision. When discussing the potential success of treatment for a patient like Appellant, Dr. Nadkarni testified:

Q. How would you help one, hypothetically?

A. Like I was saying before, usually these patients need very intensive treatment. Psychopharmacology, which is medication, can be helpful. Individual psychotherapy can be helpful. Usually they need like a comprehensive program, like a cognitive remediation program, and often they need supervision.

Q. Something like they would have in a prison?

A. Supervision for sure, yes, correct.

Q. Possible therapeutic resources also, psychiatric resources, and things like that?

A. Yes.

Q. And they could manage somewhat in a setting like that?

A. Yes.

On cross-examination, Dr. Nadkarni testified:

Q. You can't rely on anything she says, can you, because she's a pathological liar?

A. I think you have to take with a grain of salt anything she says, that's right.

And later, when discussing the facts of Appellant's crime:

Q. Okay. This is the murder lead-up. This is State's 33. This is hundreds of pages of her trying to find a victim, her hunting at places where pregnant women are found. That's some pretty intense planning that I would think someone with these deficits you're talking about would have great difficulty. The way you are talking about Taylor Parker is, how is she here? But this is the evidence. So she cannot be that dysfunctional in the frontal lobe if she is able to execute — put together and execute a plan like this.

A.     Do you want me to —

Q.     Yes. That's a question.

A.     Do you want me to respond? So she doesn't have cognitive deficits in the sense that — you know, in terms of like specific cognitive — she can plan what she's going to do tomorrow. She can plan things out in the future, but she has — I think what you're showing actually is evidence of that frontal lobe degeneration. Those people engage in schemes like this, when your frontal lobes don't work, an example of disinhibition, impulsivity. Like, it's planning illegal behavior, that's all part of frontal lobe dysfunction.

Dr. Gripon testified:

Q.     Okay. And I think to kind of wrap that up, at least does Taylor Parker have all the criteria to meet the diagnosis for antisocial personality disorder?

A.     No.

Q.     Does she have all the criteria for narcissistic personality disorder?

A.     No.

Q.     Does she have all the criteria for histrionic personality disorder?

A.     No.

Q.     And does she have all the criteria for borderline personality disorder?

A.     No.

Q.     Is that why you would use the word condition rather than disorder?

A.     Well, yeah. It's considered to be a mental condition because

it affects the person, the quality of their life, the stability of their life, their ability to maintain relationships, maintain employment sometime, those sort of things, but they don't have a full-blown disorder as we diagnose it.

When examining all the evidence, Dr. Gripon concluded:

Q. So based on everything you've looked at, is there — when we're talking about possibility versus probability, I'm not going to ask you the ultimate question, you know, is there a probability, but, in your opinion, in everything that you've looked at, is Taylor Parker a future danger?

A. I — if I said yes, I could not support that on any kind of literature, study, or information that I have. So that means my answer is, is I cannot predict that she will continue to be dangerous. Now, she will be an aggravation, and she will be manipulative, and she will continue to lie.

On-cross examination, Dr. Gripon testified:

Q. So when you say she has traits of antisocial personality disorder, what traits are you seeing specifically that make you think that she has that?

A. The tendency to be involved in illegal behavior, to run con kind of issues, to claim things to manipulate regarding finances to her benefit, you know, things that are antisocial or asocial.

* * *

Q. Okay. You also have said that somebody with antisocial personality disorder, that conduct is knowing that somebody's conduct is wrong but not caring or wanting to change it. Would you say she falls into that category?

A. Well, she — I don't know whether she does or not actually. Because of the type of personality that she has and with the pathological lying, people with that condition don't change that of their own volition.

Q.      Well, I mean —

A.      That doesn't necessarily come under antisocial. The pathological lying is unlikely to change, particularly not without extensive treatment in a setting in which she's not going to find it available.

* * *

Q.      She told a correctional officer after she was convicted, so this would have been in October of 2022, that she had to sit in here for three weeks and listen to her be shamed by us with a bunch of lies. That is not somebody that is remorseful or taking responsibility for their actions, in my opinion. Would you agree with that?

A.      Well, that statement certainly doesn't indicate remorse.

Q.      Right. But I think it also —

A.      That statement is just a lie.

Q.      Well, sure. But, I mean, you know, you're saying you saw her once in October of 2022. That statement was made in October of 2022. So she's telling whoever whatever that she decides to tell them that day?

A.      That is — she has a character defect, and that's cut from that same piece of cloth.

Q.      Okay. So when you're talking about she is going to be manipulative and continue to lie, okay, that situation sets up a very dangerous scenario for the other inmates and the correctional officers in a prison setting. Would you not agree with that?

A.      It could.

In rebuttal, the State called Dr. Proctor. Dr. Proctor testified that he did not see any evidence of mental disease or defect that would qualify as

something that he would include in his report. Dr. Proctor then testified:

> Q. What would be an example of something that you would or have on occasion, you know, made note of with this testing and these interviews?
>
> A. Sure. Well, like a severe mental disease, schizophrenia is certainly an excellent example. Schizoaffective disorder, which is a type of schizophrenia; could be bipolar disorder. You could have a major depressive disorder that was severe and even had what's called psychotic features, which means the person is out of touch with reality. You could have some other conditions that could fall into mental disease. Mental defect would be something like intellectual disability, which is what we used to call mental retardation or some kind of severe neurological problem, like a dementia, or, you know, someone who had a serious head injury that resulted in serious cognitive problems. So that's what I'm referring to there.
>
> Q. Okay. And all of those examples that you just gave the jury are things that you have sort of screened for and have seen in the past, know how to recognize, and that is just not the situation with Taylor Parker?
>
> A. Correct.

Dr. Proctor then discussed the standardized tests that he administered to Appellant. Based on these tests, Dr. Proctor concluded that Appellant "presents with psychopathic traits." Dr. Proctor further opined:

> Q. Okay. And then the borderline personality, here's some other things, antisocial and histrionic personality traits. We talk about that PCL-R again. The presence of pathological lying and manipulativeness, talk about that for just a second.
>
> A. Sure. Well, I mean, part of what came out of the assessment with this thing called the PCL-R, which is the psychopathy checklist is that there were certain traits that, you know, she

clearly had, and, in particular, the pathological lying and manipulativeness are clearly established. That is part of the personality disorder she has. And then she also has, related to that, what are called antisocial traits, which antisocial isn't like wanting to keep to yourself or being shy. It's a tendency to be willing to break rules, not follow laws, which she certainly has a history of reckless disregard for others, being irresponsible, lacking remorse. And then this histrionic piece is the being real expressive emotionally and engaging in a lot of attention-seeking behavior that has kind of a dramatic quality to it.

Q.    Okay. And then the jury has heard the malingering. I mean, it's gross exaggerating or feigning of difficulties. This is – you've identified some factors that were present. What are those factors?

A.    So the book we use to diagnose mental problems is called the Diagnostic and Statistical Manual of Mental Disorders. We call it the DSM for short, Fifth Edition, Text Revision is the current one, and it lists four factors that if these factors are present, if there's some combination of them, then you should suspect malingering; does not mean someone is malingering, does not mean someone is faking, but it means it's a red flag to consider it. So if you have somebody that's in a medicolegal context, which means something like a criminal case, like we're involved in, and there's a big discrepancy between the person's claimed stress or disability and the objective findings and observations, which we have here, lots of inconsistencies, my test results that indicated exaggerating and feigning. There's some lack of cooperation during diagnostic evaluation and in complying with prescribed treatment. And this, again, goes to, like, the test results as well as giving information that differs from doctor to doctor. And then, finally, if there's a presence of antisocial personality disorder, which I didn't find full antisocial personality disorder, but there's some traits of that. So these things are listed here because they are indications that I believe malingering should be considered here, and then so I go on to discuss what my thoughts are on that.

*ii.    Analysis*

As the record indicates, Dr. Proctor's rebuttal testimony was not outside of the scope of Appellant's experts' testimonies. Appellant's experts testified that Appellant had brain atrophy and traits of several psychiatric disorders. The State rebutted those conclusions through Dr. Proctor's testimony that ruled out Appellant's psychiatric disorders and instead attributed her behavior to psychopathy. In fact, Dr. Gripon testified that Appellant's "antisocial personality disorder" traits led her to "be involved in illegal behavior, to run con kind of issues, [and] to claim things to manipulate regarding finances to her benefit." But Dr. Proctor attributed the *same* traits to psychopathy through the psychopathy checklist. Based on the testimony in the record, Dr. Proctor's testimony was "limited to the issues raised by the defense expert[s]." *Lagrone*, 942 S.W.2d at 610 (quoting *Soria*, 933 S.W.2d at 58–59). Because Appellant "introduce[d] psychiatric evidence in some form, the State [could] also introduce psychiatric evidence in some form." *Wilkens*, 847 S.W.2d at 552. Appellant's twenty-fifth point of error is overruled.

## IX.    Conclusion

Finding no reversible error, we affirm the judgment of the trial court.

**Delivered: November 6, 2025**
**Publish**